JUDGE ABRAMS

Andrew E. Tomback
Zuckerman Spaeder LLP
1185 Avenue of the Americas
New York, NY 10035-2603
(212) 704-9600
(212) 704-4256 fax



13 CIV 3063

*Attorneys for Citibank, N.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITIBANK, N.A.,

               Plaintiff

           –against–

BARCLAYS BANK, PLC,

               Defendant.

---

RECEIVED
MAY - 3 2013
U.S.D.C. S.D. N.Y.
CASHIERS

**COMPLAINT**

        Plaintiff Citibank, N.A. ("Citibank"), by its attorneys Zuckerman Spaeder LLP, for its complaint against Barclays Bank PLC ("Barclays"), alleges as follows:

## NATURE OF THE ACTION

        1.    This is an action for breach of contract arising from Barclays' refusal to honor its agreement to indemnify Citibank for losses Citibank suffered as a result of providing—at Barclays' request—foreign exchange ("FX") settlement services to Lehman Brothers Inc. ("LBI") from September 17 to 19, 2008.

        2.    The losses at issue stem from Citibank's role as LBI's Designated Settlement Member in the Continuous Linked Settlement ("CLS")

4122751.1

system, a global multi-currency cash settlement system designed to eliminate settlement risk in FX trades.  In settling trades for LBI through the CLS system, Citibank extended millions (and often billions) of dollars of credit to LBI, exposing Citibank to substantial risk of loss were LBI to default. Citibank's CLS services were vital to LBI's operations because LBI would not have had access to the CLS settlement system without a sponsor willing to take on substantial credit risk.

3.      Citibank suffered these losses against the backdrop of a financial crisis of historic dimension.  In one of the most dramatic events of that crisis, LBI's parent company, Lehman Brothers Holdings Inc. ("LBHI"), filed for bankruptcy protection in the Southern District of New York in the early morning hours of September 15, 2008.   Although LBI continued operations despite its parent's filing, Citibank—like virtually every other market participant—was unwilling to take on substantial unsecured exposure to LBI in the ever-worsening market conditions.  Citibank agreed to continue settling CLS trades on LBI's behalf, but only on the condition that LBI establish a $1 billion deposit as security for any losses Citibank might suffer.   LBI agreed and established the requested $1 billion deposit as security.

4.      Relying on this $1 billion in collateral, Citibank continued to advance funds to settle LBI's FX trades through CLS.  By Wednesday, September 17, 2008, however, Citibank's losses from settling LBI's trades

4122751.1

through CLS had grown so large that Citibank was unwilling to continue providing settlement services without first obtaining additional collateral to cover further losses. LBI was unable to provide such collateral and, as a result, Citibank exercised its contractual right to terminate its services.

5.    Upon learning of this termination, Barclays contacted Citibank and urgently requested that Citibank continue providing CLS services to LBI. At the time, Barclays was in the process of purchasing LBI's U.S. broker-dealer business and was awaiting Bankruptcy Court approval of its purchase. Barclays thus had a compelling interest in maintaining the operation of that business until its purchase could be concluded, and Barclays agreed to deposit an additional $700 million in pledged cash collateral to induce Citibank to continue providing CLS services to LBI. That day, Citibank and Barclays executed a Pledge Agreement (the "Pledge Agreement") which, along with a supplemental agreement executed several weeks later (the "Supplement"), memorialized Barclays' obligation to indemnify Citibank for any and all losses incurred as a result of Citibank's provision of CLS services to LBI from September 17 through 19, the day LBI entered into liquidation under the Securities Investor Protection Act ("SIPA").[1]

6.    Barclays stood to gain enormous profits from LBI's continued ability to settle its FX trades in CLS. Indeed, Barclays ultimately

---

[1]   A copy of the Pledge Agreement and the Supplement are attached as Exhibits A and B, respectively.

4122751.1

recorded a massive gain—of more than USD $4 billion—on its acquisition of LBI's assets. Citibank, on the other hand, incurred principal losses of $1.260 billion as a result of providing CLS settlement services to LBI during the week of September 15 to 19, 2008. Of this amount, $580 million of the losses incurred by Citibank are directly attributable to CLS services Citibank provided to LBI from September 17 to 19, 2008, the period covered by Barclays' indemnity.

7.     Barclays' obligation to indemnify Citibank for losses covered by its indemnity is "unconditional and absolute and independent and separate from any other . . . security for or guaranty" of those losses. (Pledge Agreement § 18.) Indeed, the parties' agreement specifically provides that Barclays must pay Citibank for covered losses regardless of Citibank's failure to seek "collection, protection or realization" upon any other collateral securing these losses; regardless whether Citibank "release[s] . . . any [other] direct or indirect security" for these losses or "release[s] . . . any other pledgor . . . or any party" potentially liable for the losses; regardless of any action by Citibank that might "deprive [Barclays] of any right of subrogation, contribution or reimbursement" against any other party; and regardless of any choice Citibank might make in applying payments including any "subordination by [Citibank] of the payment of [covered losses] to the payment of any other liability [of LBI]." (*Id.* §§ 18(iii), (vii), (ix) and (x).)

4122751.1

8.     Thus, Citibank could have demanded immediate payment from Barclays up to the full $580 million without first seeking payment from LBI, the original obligor, for its losses.  Instead, Citibank has spent the last four and a half years litigating, negotiating, and ultimately settling with LBI (on terms that are extremely favorable to Barclays) to reduce the principal amount of the indemnified losses to $91 million—less than 16% of Barclays' original liability of $580 million.  Along with interest and a modest amount of legal fees (both explicitly covered by the indemnity), Citi has made a total demand of more than $139 million.

9.     In clear breach of the parties' agreement, Barclays has refused Citibank's repeated demands that it honor its indemnity.  The law— and equity—requires Barclays to pay the amount Citibank currently claims.

10.     Accordingly, Citibank seeks relief from this Court in the form of a judgment against Barclays for breach of the Pledge Agreement and Supplement, and seeks an amount in damages reflecting Citibank's current claim for uncompensated CLS-related losses, plus interest, associated legal fees, and all other losses proximately caused by Barclays' failure to timely fulfill its obligations under the Pledge Agreement and Supplement.

## THE PARTIES

11.     Citibank is a national banking association and a wholly owned subsidiary of Citigroup, Inc.  As set forth in its articles of association,

4122751.1

Citibank has its main office at 701 E. 60th Street North, Sioux Falls, South Dakota 57117, and is therefore a citizen of the State of South Dakota.

12.   Barclays is a public limited company authorized under the laws of the United Kingdom, with its principal place of business at 1 Churchill Place, London, United Kingdom E14 5HP, and is therefore a citizen of a foreign state.

## JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because the parties are of diverse citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.   This Court has personal jurisdiction over Barclays because Barclays has consented to personal jurisdiction in New York under Section 20 of the Pledge Agreement and Supplement.

15.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), and by agreement of the parties under Section 20 of the Pledge Agreement and Supplement that any action arising out of or relating to the Pledge Agreement be heard and determined in New York State or Federal Court in New York City.

4122751.1

## STATEMENT OF FACTS

*Citibank-LBI CLS Relationship*

16.    Before LBHI's bankruptcy filing, Citibank provided FX settlement services to LBI through CLS.

17.    The CLS FX settlement system was developed as an industry response to the systemic risks associated with the traditional method of settling FX trades.    Under the traditional method, each counterparty to an FX trade transfers to the other counterparty the currency it has sold.  The two transfers take place independently of one another, and they are typically made to the counterparties' designated banks in the relevant countries.  Thus, each counterparty is exposed to the risk of paying out the currency it sold but not receiving the currency it bought.  This risk, known as "settlement risk" or "Herstatt Risk,"[2] is heightened where the currencies being exchanged belong to countries in different time zones, increasing the timing difference between the two transfers.

18.    In 2002, in response to growing concern over settlement risk in FX trading, banks from the largest economies in the world established CLS Bank International ("CLS Bank"), a special-purpose bank that operates

---

[2]    "Herstatt Risk" refers to the well-known failure of the German bank, Bankhaus Herstatt, which German regulators closed on June 26, 1974 at 3:30 PM Central European Time, after counterparties had made Deutschemark payments to Herstatt on FX trades but before Herstatt made corresponding dollar payments in the U.S. markets.  The failure of Bankhaus Herstatt left counterparties with substantial losses and caused disruptions of payment and settlement systems in the U.S. and abroad.  *See The New Palgrave Dictionary of Money & Finance*, 303–04 (Peter Newman et al. eds., 1992); *A Dictionary of Business & Management* 476 (Oxford Univ. Press 4th ed. 2006); *The Concise Blackwell Encyclopedia of Management* 237 (Cary L. Cooper & Chris Argyris eds., 1998).

4122751.1

a multi-currency cash settlement system that can settle FX trades in the most common currencies based on a simultaneous exchange.   This simultaneous exchange eliminates settlement risk.

19.   Participants may join CLS Bank as either a Settlement Member or a User Member.  Settlement Members, such as Citibank, have full access to all CLS services—they can submit information about FX trades (the "Instructions") to be settled in CLS and they have a multi-currency account with CLS Bank through which they make and receive payments due on these trades.

20.   A User Member, such as LBI, does not have an account with CLS Bank.  To execute FX transactions through the CLS system, a User Member must be sponsored by a Designated Settlement Member.  While a User Member may submit Instructions about its FX trades directly to the CLS system, those Instructions will not be processed for settlement unless they have been authorized by its Designated Settlement Member.  By authorizing the Instructions of a User Member, the Designated Settlement Member becomes fully responsible to CLS Bank to make all payments necessary to settle those Instructions.

21.   On the settlement date, CLS Bank simultaneously debits and credits the accounts of each Settlement Member in the currencies and amounts provided in the Instructions it submitted or authorized.  CLS Bank

8

will not settle either leg of an FX trade unless it can successfully debit the appropriate amounts from both Settlement Members' CLS accounts.

22.    The CLS system effectively shifts the settlement risk of User Member trades away from the User Member's counterparties and onto its Designated Settlement Member.  The User Member's FX counterparties can rely on the functioning of the CLS system to ensure that they will not pay out on one leg of a trade but receive nothing in return.  In contrast, the Designated Settlement Member, which takes principal responsibility for and fronts payments with respect to a User Member's trades, assumes the risk that the User Member will not repay the outlays made on its behalf.

23.    During the relevant period, LBI was a User Member of CLS Bank and Citibank acted as LBI's Designated Settlement Member.  The parties' relationship was governed by the CLS Settlement Services Amended and Restated Agreement for CLS User Members, dated October 28, 2004 (the "CLS Agreement").

24.    In the CLS Agreement, Citibank agreed to act as LBI's Designated Settlement Member with respect to trade Instructions submitted by LBI and authorized by Citibank.  The parties acknowledged that Citibank extended credit to LBI when it authorized LBI's FX transactions in the CLS system because, under CLS Bank rules, Citibank became fully responsible as principal for all instructions it authorized.  The CLS Agreement makes clear that *"any extension of credit on behalf of [LBI] is within Citibank's*

*sole discretion* and may be changed or discontinued at any time without prior notice . . . provided, however, that Citibank may not without [LBI's] consent, cancel or rescind any instruction that Citibank has previously authorized." (CLS Agreement § 1.) (emphasis added).

25.     Under the CLS Agreement, LBI was obligated to reimburse Citibank the same day (at specified cut-off times applicable to the various currencies) for all payments Citibank made to CLS Bank on LBI's behalf (*i.e.*, short balances).   In practice, Citibank was often required to pay out to LBI certain "long balances" received from CLS Bank with respect to LBI's trades (particularly in the Asian, Australian and New Zealand currencies) before Citibank was due to receive payment from LBI to cover short balances (particularly in North American currencies).   To accommodate this fact, Citibank established an overdraft limit for LBI and paid out long positions—thus incurring exposure to LBI—up to the established limit.   If LBI failed to repay the "short balances" owing to Citibank, Citibank was entitled, under the CLS Agreement, to withhold a corresponding amount of the "long balances" CLS Bank had paid to Citibank with respect to LBI's FX trades. (CLS Agreement § 2.)

26.     The CLS Agreement gave Citibank the right to terminate the Agreement, "immediately [and] without notice" if, among other things; (i) LBI failed to repay a "short balance" in any currency by the applicable cutoff time; (ii) "a bankruptcy, reorganization, receivership, insolvency, or other

4122751.1

similar proceeding" was instituted against LBI, its parent or any material subsidiary; (iii) LBI became "unable to pay its debts as they become due or admit[ted] in writing its inability to pay its debts generally"; or (iv) "upon the occurrence of a material adverse change in the financial or other condition of [LBI], as Citibank may determine in its sole discretion."   (CLS Agreement § 6.)

***The $1 Billion Deposit***

      27.   Until September 2008, Citibank had extended overdraft lines to LBI in connection with CLS settlement on an unsecured basis.

      28.   On September 9, 2008, however, LBHI's stock price plummeted in response to news that Korea Development Bank, which had been considering making an equity investment in LBHI, had ended its discussions with LBHI.   In view of increasing market anxiety about Lehman's prospects, Citibank made an institutional decision not to accept any unsecured exposure to any Lehman entity, including LBI.

      29.   On September 9, 2008, Citibank requested that LBHI add LBI as a guaranteed subsidiary under the Guaranty Agreement between Citigroup, Inc. and LBHI, dated January 7, 2004 (the "2004 Guaranty").

      30.   In response to Citibank's request, LBHI executed an amendment to the 2004 Guaranty on September 9, 2008 (the "September Amendment"), which added LBI, along with other LBHI subsidiaries, as a guaranteed entity.   A $2 billion general deposit LBHI had placed with

4122751.1

Citibank in June of 2008 (the "$2 Billion Deposit"), provided Citibank with security (in the form of common law rights of setoff against the $2 Billion Deposit) for LBHI's guaranty obligations under the 2004 Guaranty and September Amendment, so long as LBHI maintained that deposit with Citibank.

31.     Following LBHI's execution of the September Amendment, Citibank continued extending credit to LBI for the purpose of settling LBI's FX transactions through the CLS system.

32.     In the early morning hours of September 15, 2008, LBHI and many of its subsidiaries filed a petition for relief under chapter 11 of the Bankruptcy Code.   LBI, by contrast, continued to operate outside of bankruptcy to promote a possible sale and otherwise achieve an orderly wind down of its business.

33.     On September 15, 2008, Citibank settled the LBI trades it had previously authorized in the CLS system and paid out to LBI the "long positions" it received from CLS Bank with respect to LBI's trades.   LBI, however, defaulted on its obligation to repay Citibank for several "short balances" in currencies Citibank had paid into CLS Bank with respect to LBI's trades.

34.     Because Citibank was uncertain whether its existing exposures to LBHI—unrelated to LBI—would exhaust the $2 Billion Deposit, Citibank was unwilling to continue extending credit to LBI in connection

4122751.1

with CLS services solely on the basis of the $2 Billion Deposit. Thus, Citibank exercised its contractual right to terminate the CLS Agreement with immediate effect on September 15, 2008, and resigned as LBI's Designated Settlement Member.

35. LBI, however, urgently requested that Citibank rescind the termination so that LBI could continue to settle its FX trades in the CLS system. CLS settlement—which eliminated settlement risk for LBI's FX counterparties—was particularly vital to LBI at this time because counterparties were refusing to take on LBI risk. Citibank was similarly unwilling to take on unsecured exposure to LBI at this time, and thus, Citibank requested a $1 billion cash deposit from LBI as security for any and all CLS-related losses before Citibank would agree to act as LBI's Designated Settlement Member for the next day.

36. Citibank and LBI executed a letter agreement dated September 15, 2008 (the "September 15 Letter Agreement"), under which Citibank agreed to provide CLS services to LBI through September 16, 2008, and LBI agreed to establish a $1 billion collateral deposit as security for any losses related to Citibank's provision of CLS services to LBI (the "$1 Billion Deposit"). The September 15 Letter Agreement provided that "Citibank shall have the right at all times to set off the amount of the referenced deposit account against any obligations of Lehman Brothers Inc. . . . under the CLS Agreement."

4122751.1

37.     Based on this $1 billion in collateral, Citibank authorized LBI's Instructions that were due to settle in CLS on September 16, 2008. Citibank also established an overdraft limit for LBI on the strength of the $1 billion in collateral so that, despite LBI's default, Citibank could remit "long positions" to LBI on September 16.   Citibank thus settled LBI's trades in CLS, and remitted certain "long positions" to LBI, up to the established overdraft limit.   That day, however, LBI again failed to repay Citibank for certain "short positions" owing.

38.     As a result of LBI's failure to pay these short balances, LBI soon exceeded its overdraft limit.   For that reason, Citibank began to exercise its right to withhold, as further security for LBI's obligations, certain long positions Citibank had received from CLS Bank with respect to LBI's trades.   The long positions Citibank withheld, however, were in different currencies than the short positions LBI had failed to repay.   Given the extreme volatility in the FX market at this time, Citibank began to run significant FX risk that the long positions it held would lose value relative to the short positions LBI owed.

39.     On September 16, 2008, LBI requested that Citibank continue settling its FX trades through CLS, for September 17, 2008.   The parties executed a second letter agreement on September 16, 2008 (the "September 16 Letter Agreement," and together with the September 15 Letter Agreement, the "Letter Agreements"), which carried forward

14

substantially the same terms as the September 15 Letter Agreement, again providing that "Citibank shall have the right at all times to set off the amount of the referenced deposit account against any obligations of LBI under the CLS Agreement." Relying on the $1 billion collateral deposit, Citibank authorized LBI's trades in the CLS system for September 17 and advanced the funds to CLS Bank that were due that day to settle LBI's FX trades.

      40.   On September 17, 2008, however, LBI again failed to repay to Citibank amounts funded on LBI's behalf. And so Citibank continued to exercise its right to withhold long balances it had received from CLS Bank. Given that LBI had exceeded the overdraft limit Citibank had established on the strength of the $1 billion of collateral and that Citibank faced substantial—and increasing—FX risk as a result of the accumulated "long positions" it was withholding, Citibank requested additional cash collateral from LBI before it would agree to continue providing CLS services. But LBI informed Citibank that it had no additional collateral to post and Citibank, therefore, immediately terminated the CLS Agreement.

***The Barclays Pledge***

      41.   Shortly thereafter, Barclays' senior management called Citibank's senior management, and urgently requested that Citibank continue providing CLS services to LBI. Barclays agreed to pledge $700 million to Citibank to induce Citibank to continue providing CLS services to

4122751.1

LBI.  At the time, Barclays had agreed to purchase LBI's U.S. broker-dealer business, and was awaiting Bankruptcy Court approval of the sale.  So Barclays had a strong interest in sustaining LBI's operations until the sale could be concluded.

42.    Citibank and Barclays executed a Pledge Agreement on September 17, 2008 governing the $700 million cash collateral.

43.    The Pledge Agreement provides that Citibank may "in its sole discretion" make available to LBI "certain cash management services which require the extension of credit by [Citibank] including, but not limited to . . . CLS Services, and daylight overdraft lines and temporary overdraft lines in connection with the provision of CLS Services (collectively, the 'Services')." (Pledge Agreement, Preliminary Statement (2).)  The agreement further provides that it is a "condition precedent to the availability of the Services" that Barclays deposit $700 million in a cash collateral account at Citibank and grant Citibank "a security interest in and express right of setoff against" the account.  (Id., Preliminary Statement (4), § 1.)  The agreement makes clear that Citibank retained the ability "to terminate at any time in its sole discretion" its provision of services to LBI.  (Id., Preliminary Statement (3).)

44.    The Pledge Agreement provides that it "secures the payment" of all obligations of LBI "now or hereafter existing under and in connection with the Services, including, without limitation, whether for

4122751.1

payment of any overdrafts, principal, interest, fees, expenses or otherwise."
(Pledge Agreement § 2.)

      45.   The Pledge Agreement provides further that "[a]ll rights of [Citibank], all security interests hereunder and all obligations of [Barclays] hereunder are unconditional and absolute and independent and separate from any other  . . . security for or guaranty of the Obligations, whether executed by [Barclays] or any other person or entity." (Pledge Agreement § 18.)   The agreement further states that "the obligations of [Barclays] hereunder shall not be released, discharged or otherwise affected or impaired by" any conceivable equitable or legal discharge.   To this end, Section 18 contains a lengthy and detailed—yet non-exhaustive—list of potential events that the parties agreed would *not* result in a discharge of Barclays' obligations and would *not* impair any rights that Citibank was granted under the parties' agreement.  This list includes the following:

> (i)    any extension, renewal, settlement, compromise, acceleration, waiver or release in respect of any Obligation under the Service Agreements or any other agreement or instrument evidencing or securing any Obligation; . . .

> (iii)  any release, non-perfection or invalidity of any direct or indirect security for any Obligation . . . or any release of any other pledgor or pledgors or any party in respect of any Service Agreement; . . .

> (v)  the existence of any claim, set-off or other right which [Barclays] or LBI may have at any time against [Citibank]  . . . whether in connection herewith or any unrelated transaction;

4122751.1

(vi) any invalidity or unenforceability relating to or against [Citibank] for any reason of any Service Agreement or any other agreement or instrument evidencing or securing any Obligation;

(vii) any failure by [Citibank] . . . to file or enforce a claim against [Barclays] or LBI or its estate [or] to proceed with due diligence in the collection, protection or realization upon any collateral securing the Obligations;

(viii) any direction as to application of payment by [Citibank] or any other person or entity;

(ix) any subordination by [Citibank] of the payment of any Obligation to the payment of any other liability . . . of [Barclays] or LBI to their creditors;

(x) any act or failure to act by [Citibank] . . . which may deprive [Barclays] of any right to subrogation, contribution or reimbursement against any other person or entity or any right to recover full indemnity for any payments made by [Barclays] in respect of the Obligations; and

(xi) any other act or omission or delay of any kind by [Citibank] or any other person or entity or any other circumstance whatsoever which might, but for the provisions of this clause, constitute a legal or equitable discharge of [Barclay's] obligations hereunder.

(*Id.* §§ 18(i), (iii), (v), (vi), (vii), (viii), (ix), (x) and (xi).)

46.    The Pledge Agreement thus explicitly provides that Barclays' obligation to indemnify Citibank for covered exposure is absolute, and unaffected by any actions taken (or not taken) by Citibank with respect to any other potential obligor (such as LBI) or any other collateral that

18

potentially might be available for this exposure (such as the $1 Billion Deposit or the September Amendment and the $2 Billion Deposit).

47.     After the parties executed the Pledge Agreement and Barclays deposited $700 million in the cash collateral account at Citibank on September 17, 2008, Citibank withdrew its termination of the CLS Agreement.   Citibank's letter to LBI withdrawing its termination stated expressly that its withdrawal was "[i]n consideration of the pledge over an additional cash deposit granted in [Citibank's] favour by Barclays Bank PLC."

48.     Citibank continued to provide CLS settlement services to LBI through September 19, 2008, in reliance on the additional $700 million pledge.   Based on the increased collateral, Citibank increased its overdraft limit for LBI and once again remitted "long positions" to LBI, up to this increased limit.   While LBI paid certain short balances owed to Citibank, LBI failed to repay Citibank for most short balances and Citibank's exposure to LBI soon reached the increased overdraft limit.   At that point, Citibank again withheld long positions received from CLS Bank on LBI's trades as further security against its LBI exposure.

49.     On the morning of September 19, 2008, the Securities Investor Protection Corporation ("SIPC") issued a statement that it would be placing LBI into liquidation under SIPA that day.   Due to the significant unreimbursed short positions that LBI had accrued over that week, as well as

19

the significant FX losses Citibank had sustained with respect to the long positions it had accumulated, Citibank knew it had at least $1 billion of CLS-related exposure to LBI as of that date.  Citibank thus exercised its right to set off LBI's $1 Billion Deposit against this exposure shortly before SIPC filed its liquidation complaint against LBI.   LBI's liquidation proceeding is pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

***Citibank Unwinds LBI's CLS Position***

50.    By the end of the day on September 18, 2008, as a result of LBI's continued failure to repay short balances owing and Citibank's withholding of certain long balances, Citibank had a total short position in its U.S. dollar account of approximately $17 billion and long and short positions in fifteen foreign currencies, which netted to a long position worth approximately USD $16 billion.   On September 19, 2008, Citibank's FX trading business began to unwind these LBI positions, selling off long currencies and buying short currencies in the market.  While the FX traders were unwinding these September 18 balances, additional positions were built up over the day on September 19, as a result of the CLS settlements occurring that day and LBI's failure to pay the short balances attributable to these trades.

51.    Citibank unwound the vast majority of LBI's foreign currency positions (over 89% by dollar amount) on September 19, 2008.  A

4122751.1

small percentage of the positions (approximately 11% by dollar amount) were closed out on September 22, 2008.  Residual amounts (less than 1% by dollar amount) were closed out on September 26 and 29, 2008.

52.   Citibank made every effort to unwind LBI's CLS positions in a fair and reasonable manner.  For example, Citibank instructed its FX traders to prioritize the CLS unwind, to transact predominantly in standard-sized trades to avoid moving the market against LBI, and to trade at times of peak liquidity for each local currency to obtain better rates.

53.   Citibank faced significant challenges performing this unwind in one of the most volatile periods in FX market history.  LBI's CLS positions encompassed 15 foreign currencies, spanning North America, Europe, Asia, and the Pacific.   Some of LBI's positions were massive. Unwinding such large and varied positions required coordination across six separate FX trading desks at Citibank—an undertaking that demanded significant time and effort from Citibank's traders.  For example, to unwind Lehman's Japanese Yen ("JPY") position, Citibank's FX traders in New York and Tokyo executed 1,361 separate USD/JPY trades.

54.   The substantial time and resources devoted by Citibank's FX traders to unwind LBI's CLS positions diverted them from conducting their own trading in this highly volatile (and hence potentially highly lucrative) market.  In performing the unwind trades, Citibank passed on the rates it received in the market directly to LBI.  Partially to compensate

21

Citibank for its time, efforts, and lost opportunities, Citibank's FX trading desks applied a reasonable commercial spread of 10, 15, or 20 basis points to these trades, depending on the currency's liquidity and the amount Citibank was forced to unwind. These spreads are consistent with the spreads Citibank charges clients for handling similarly-sized orders. The total commercial spread applied to unwinding LBI's CLS positions from September 17 to 19, 2008—the period covered by Barclays' indemnity—was approximately $11 million.

55. Based on the unwind, Citibank incurred total principal losses of $1.260 billion as a result of providing CLS services to LBI from September 15 to 19, 2008; $580 million of this amount is directly attributable to the services Citibank provided from September 17-19, 2008, the time period covered by the indemnity. Citibank's setoff against the $1 Billion Deposit on September 19, 2008, left Citibank with $260 million in remaining principal losses.

### Barclays Purchases LBI Assets

56. Following LBHI's bankruptcy filing on September 15, 2008, Barclays began negotiations to purchase certain assets of LBI. In connection with these discussions, LBHI, LBI and Barclays signed an Asset Purchase Agreement on September 16, 2008. The Asset Purchase Agreement provided for the sale of LBI's U.S. brokerage business, as well as other related assets and real estate, to Barclays (the "Sale Transaction").

4122751.1

57.   On September 17, 2008—the same day Barclays pledged $700 million to induce Citibank to continue providing CLS services to LBI— LBHI filed a motion in the Bankruptcy Court seeking approval of the Asset Purchase Agreement.   The Bankruptcy Court conducted a hearing on the motion on September 19, 2008, and the Court approved the Sale Transaction shortly after midnight on Saturday, September 20, 2008.   The Sale Transaction closed on Monday, September 22, 2008.

58.   The Sale Transaction was extremely profitable for Barclays.  Barclays' 2008 Results Announcement stated that "[t]he excess of the fair value of net assets acquired [from LBI] over consideration paid resulted in £2,262m of gains on acquisition"—or a day one profit of approximately USD $4 billion, at September 2008 exchange rates.  (*See* Barclays PLC Results Announcement, Figures 2008, at 95.)

*Supplement to the Pledge Agreement*

59.   A few weeks after the Sale Transaction closed, Barclays requested that Citibank return the $700 million cash collateral deposited with Citibank, and rely for repayment of its CLS losses solely on an unsecured indemnity from Barclays.   Given Citibank's longstanding relationship with Barclays and Barclays' creditworthiness, Citibank agreed.

60.   Beginning in October 2008, the parties negotiated replacing the $700 million in cash collateral with an unsecured indemnity. In connection with these negotiations, Barclays noted two aspects of the

23

original Pledge Agreement that it felt did not reflect the parties' original business understanding.  First, Barclays wished to explicitly limit its liability to Citibank to $700 million (the amount of the cash deposit Barclays pledged to Citibank on September 17, 2008), whereas the Pledge Agreement provided that Barclays would be required to replenish the $700 million deposit if Citibank drew down on the deposit to cover its losses.  Second, Barclays sought to limit its liability to Citibank's losses arising from the provision of Services from September 17 to 19, 2008, rather than the entire week of September 15, as the Pledge Agreement provided.  Citibank agreed to both requested changes.

61.   On November 13, 2008, the parties executed a Supplement to the Pledge Agreement, in which Citibank agreed to return the $700 million in cash pledged by Barclays and maintained at Citibank (together with interest and other income earned on the cash) and Barclays agreed to amend and restate Section 23(a)—the indemnification provision— of the Pledge Agreement to provide a broad indemnity for all losses attributable to Citibank's provision of Services to LBI from September 17 to 19, 2008, up to a maximum of $700 million.  The amended indemnity provision provides that:

> ***The Pledgor agrees to indemnify [Citibank]***, its affiliates and subsidiaries and the directors, officers, trustees, agents and employees of the foregoing (each an "Indemnitee") and hold each Indemnitee harmless ***from and against any and all liabilities, obligations, losses***, damages,

4122751.1

penalties, claims, demands, actions, suits, judgments, *costs and expenses of any kind, including, without limitation, the reasonable fees and disbursements of counsel* to any Indemnitee, in each case whether now existing or hereafter arising (each a "Loss" and collectively, "Losses") *incurred or suffered by an Indemnitee relating to or arising out of this Agreement, the Services provided from and including September 17 through September 19, 2008 or the Service Agreements in respect of such Services or in any other way connected with the enforcement of any of the terms of, or the preservation of rights hereunder*, . . . or any claims arising as a result of any avoidance or reversal of any setoff by an Indemnitee or application of other collateral by an Indemnitee, whether as a result of a decision made by an Indemnitee in its sole discretion, an agreement between an Indemnitee and any party other than Pledgor, a court order, or otherwise, *which Losses would have constituted Obligations under the Pledge Agreement secured by the Collateral.*

(Supplement § 1.) (emphasis added). In all other respects, the original Pledge Agreement remained in full force and effect.

62. The amended indemnification provision recites only two limitations. First, as in the Original Pledge Agreement, Citibank would not have the right to be "indemnified hereunder for [Citibank's] own gross negligence or willful misconduct," or that of its affiliates, directors, trustees, agents or employees, as determined by "a court of competent jurisdiction in a final, non-appealable judgment or order." (Supplement § 1.) Second, and consistent with Barclays' request, the Supplement provides that "in no event will the Pledgor's aggregate liability to the Indemnitees under this indemnity exceed $700,000,000." (*Id.*)

4122751.1

63.    The Supplement further provides that "[t]he Pledgor confirms that its indemnity obligations . . . remain in full force and effect in accordance with Section 23(b) of the Pledge Agreement, notwithstanding the full payment of all Obligations and notwithstanding the discharge thereof." (Supplement § 2.)

**LBI Adversary Proceeding**

64.    For more than two years following the commencement of LBI's liquidation proceeding, Citibank exchanged substantial information with LBI to validate Citibank's CLS claim and its setoff against LBI's $1 Billion Deposit.  On May 30, 2009, Citibank filed a proof of claim against LBI, asserting a claim for the remaining $260,326,894 in principal losses under the CLS Agreement plus interest and legal fees, as well as a contingent claim for the additional $1 billion that Citibank had set off on September 19, 2008, in the event that setoff was ever reversed for any reason.

65.    On March 18, 2011, LBI commenced an adversary proceeding against Citibank and various Citibank affiliates in the Bankruptcy Court captioned *Lehman Bros. Inc.* v. *Citibank, N.A. et al.*, Adv. Proc. No. 11-01681 (Bankr. S.D.N.Y.) (JMP).  LBI's complaint challenged Citibank's setoff of the $1 Billion Deposit, and asserted claims under federal bankruptcy and state law to avoid and recover that deposit.  LBI's complaint also sought to recover approximately $342 million in additional cash and securities of LBI and opposed vehemently any effort by Citibank to set off

26

CLS-related obligations against these amounts. The majority of these deposits had been made at Citibank affiliates (not Citibank) or deposited at LBI's accounts at Citibank after the commencement of LBI's liquidation proceeding and thus had no relationship to Citibank's provision of CLS services. Decisions issued by the bankruptcy judge presiding over LBI's liquidation proceeding created substantial uncertainty as to whether the requisite "mutuality" existed to permit Citibank to set off the obligations owed by Citibank to LBI in respect of these affiliate and post-liquidation deposits against LBI's pre-liquidation CLS obligations to Citibank. Notably, LBI's complaint did not challenge Citibank's calculation of the principal amount owed by LBI under the parties' CLS Agreement.

66.     On March 30, 2011, shortly after the filing of LBI's adversary proceeding against Citibank, Citibank wrote to Barclays tendering the defense of the litigation to Barclays under the Pledge Agreement. Specifically, Citibank informed Barclays that "[t]he allegations in the [LBI] Trustee's complaint include matters within the scope of the indemnification obligations of Barclays to Citi under the Pledge Agreement," and inquired "whether Barclays wishes to participate in the litigation on Citi's behalf to the extent of matters within the scope of the Pledge Agreement."[3] Barclays never responded to Citibank's letter; nonetheless, Citibank continued to keep

---

[3]     A copy of Citibank's March 30, 2011 letter to Barclays is attached as Exhibit C.

27

Barclays informed of significant developments in the LBI adversary proceeding.

67.   In fact, months before LBI commenced the adversary proceeding, Citibank had reached out to engage Barclays in discussion about Barclays' obligation to indemnify Citibank pursuant to the parties' Pledge Agreement and Supplement.   In a series of in-person meetings and telephone calls over the next two and a half years, representatives of Citibank explained Citibank's CLS claim to representatives of Barclays, furnished Barclays with extremely detailed information fully supporting Citibank's calculation of its CLS-related principal losses (the same information Citibank provided to LBI) and answered all of Barclays' questions about the CLS claim.

***Citibank's Settlement with LBI***

68.   In May 2011, Citibank and its affiliates filed a motion to dismiss the LBI complaint in the adversary proceeding, and a separate motion for authority to exercise setoffs against approximately $285 million in additional deposits and other amounts otherwise payable by Citibank and its affiliates to LBI.  Briefing on both motions was completed in September 2011. While the motions were pending, Citibank and the LBI Trustee engaged in extensive settlement discussions.  Citibank kept Barclays apprised of these discussions and invited Barclays to participate in them.  Yet, for the most part, Barclays demurred.

4122751.1

69.   On November 16, 2012, Citibank and the LBI Trustee agreed to a settlement (the "Settlement Agreement"), pursuant to which Citibank would have an allowed claim against LBI for the full $1.260 billion of Citibank's CLS-related principal losses:  $1,007,590,537 billion of the claim would be secured (thus preserving Citibank's $1 billion setoff and permitting a further setoff of more than $7 million) and the remaining $252,736,357 would be allowed as a general unsecured claim against the LBI estate (the "CLS Unsecured Claim").   In January 2013, Citibank sold the CLS Unsecured Claim for $161,119,427.59 at an auction in which Barclays participated but was not the highest bidder.  Factoring in these sale proceeds, as well as $826,385.48 in additional LBI cash deposits that reverted to Citibank, the Settlement Agreement enabled Citibank to reduce its CLS-related principal losses from $1.260 billion to only $90,790,532.93, plus interest and legal fees.  The Settlement Agreement, however, did not provide Citibank with any recovery on its interest claim with respect to the $260 million CLS-related losses that had been outstanding for over four years.

**Citibank's Demand of Barclays Under the Indemnity**

70.   On February 1, 2013, Citibank wrote to Barclays demanding payment of $137,985,745.75 under the Pledge Agreement and Supplement.  In its letter, Citibank informed Barclays that, after applying the setoffs permitted under the Settlement Agreement, the proceeds of the

4122751.1

sale of the CLS Unsecured Claim, as well as additional LBI cash deposits that reverted to Citibank under the Settlement Agreement, Citibank's outstanding CLS exposure had been reduced to $90,790,532.93. In addition, Citibank conservatively claimed interest on the amount of the CLS claim that had not been set off on September 19, 2008, calculated at a conservative rate of 3.748% compounded daily, for a total of $47,025,182.33. Finally, Citibank also claimed $160,019.49 in legal fees and expenses. Citibank asked Barclays to honor its indemnification obligation under the Pledge Agreement and Supplement and to remit payment of $137,985,745.75, to Citibank on or before February 11, 2013.[4]

71.    In addition, Citibank's February 1 letter to Barclays reiterated the fact, previously discussed by the parties, that Barclays' indemnification obligation could increase further as a result of a separate adversary proceeding filed by LBHI against Citibank and several of its affiliates on February 8, 2012, captioned *Lehman Bros. Holdings Inc., et al.* v. *Citibank, N.A., et al.*, Case No. 08-01044 (Bankr. S.D.N.Y.) (JMP) (the "LBHI Proceeding"). In the LBHI Adversary Proceeding, LBHI seeks, among other things, (1) to avoid and recover a $500 million transfer LBHI made to LBI on September 14, 2008 to fund LBI's CLS activities, at least a portion of which became part of the $1 Billion Deposit against which Citibank set off its CLS exposure on September 19, 2008, and (2) to avoid the September Amendment

---

[4]    A copy of Citibank's February 1, 2013 letter to Barclays is attached as Exhibit D.

4122751.1

by which LBI was added as a guaranteed subsidiary to the 2004 Guaranty. LBHI's successful avoidance of the $500 million transfer, or a portion thereof, could substantially increase Citibank's CLS-related losses by undoing a portion of the setoffs that were authorized under Citibank's Settlement Agreement with LBI.   The Pledge Agreement and Supplement provide explicitly that Barclays' indemnity obligation shall "remain in full force and effect . . . notwithstanding the full payment" and discharge of all covered losses and that Barclays is obligated to pay any claim for covered losses arising "as a result of any avoidance or reversal of any setoff by [Citibank] or application of other collateral by Citibank, whether as a result of a decision made by [Citibank] in its sole discretion, an agreement between [Citibank] and any [other] party . . . ., a court order, or otherwise." (Supplement §§ 1, 2.) Citibank's February 1 letter, therefore, reserved all of Citibank's rights under the Pledge Agreement and Supplement if LBHI were to prevail in the LBHI Proceeding with respect to any portion of the $500 million transfer.

72.    Barclays did not respond to Citibank's demand for payment until February 13, 2013—days after the deadline for Barclays to remit payment.  Barclays' February 13 letter reprised a number of objections Barclays had raised previously with respect to Citibank's calculation of its CLS claim, all of which Citibank had refuted over the prior two years.[5]

---

[5]    A copy of Barclays' February 13, 2013 letter to Citibank is attached as Exhibit E.

4122751.1

73.    Citibank responded in a letter dated March 4, 2013, again refuting each of Barclays' objections, demanding payment of $139,056,130.92 under the indemnity (including accrued interest from February 2, 2013 of $969,008.42 and legal and advisory fees of $101,376.75), and threatening legal action if payment was not immediately forthcoming.[6]

74.    Following Citibank's March 4 letter, the parties made further exchanges of information and positions.  But in the end, Barclays refused to honor its indemnification obligations.

75.    Barclays' refusal to honor its indemnity obligation to Citibank under the parties' Pledge Agreement and Supplement is inexcusable.  Barclays was fully aware that, as soon as Citibank settled its litigation with LBI, Citibank would turn to Barclays to satisfy its remaining CLS-related exposure.  Barclays has had every opportunity over four and a half years to pose whatever questions it might have with respect to Citibank's calculations of its CLS-related losses, and Citibank has answered every question posed.  Barclays' repeated tactic of recycling baseless objections that Citibank has long ago refuted is a transparent attempt to avoid its obligations.

76.    While Citibank deserves Barclays' gratitude for acceding to Barclays' urgent request that Citibank continue providing CLS services to LBI, for unwinding the LBI positions in a fair and reasonable manner, and

---

[6]    A copy of Citibank's March 4, 2013 letter to Barclays is attached as Exhibit F.

4122751.1

for choosing first to pursue payment from the primary obligor (LBI), Barclays has instead flagrantly breached its obligation to indemnify Citibank under the parties' Pledge Agreement and Supplement.  The clear and unambiguous provisions of the parties' agreement—not to mention fundamental fairness and equity—entitle Citibank to relief.

## CAUSE OF ACTION
### (Breach of Contract)

77.    Plaintiff repeats and realleges each of the allegations set forth above, as if fully realleged here.

78.    Citibank has performed all of its obligations under the Pledge Agreement and Supplement.

79.    Citibank has made a demand that Barclays pay Citibank the amount owed under the Pledge Agreement and Supplement.

80.    Barclays has breached its obligation to indemnify Citibank under the Pledge Agreement and Supplement and has refused to pay Citibank the amount owed under the Pledge Agreement and Supplement. Instead, Barclays has raised baseless objections to Citibank's calculation of the amount owed.

81.    As a result of Barclays' breach of its contractual obligations, Citibank has been damaged in an amount to be determined at trial, but currently believed to be substantially more than $141 million as of

May 6, 2013,[7] plus interest accrued and accruing thereafter, along with Citibank's fees and other expenses incurred in enforcing its rights to these amounts.

## **PRAYER FOR RELIEF**

WHEREFORE, Citibank respectfully requests that the Court enter a judgment against Barclays as follows:

(i)     awarding Citibank all of its damages incurred as a result of Barclays' breaches of its contractual obligations, in an amount to be determined at trial, but currently believed to be substantially more than $141 million as of May 6, 2013, plus prejudgment interest at the applicable legal rate and legal fees;

(ii)    awarding Citibank all fees and other expenses, including but not limited to attorneys' fees, incurred in connection with its collection of the amounts due under the Pledge Agreement and Supplement; and

(iii)   such other and further relief as the Court may deem proper.

Dated:      May 6, 2013
            New York, New York

---

[7]   The rate of interest Citibank used in calculating its February 1, 2013 demand under the indemnity was an estimate of Citibank's cost of funds based on a three-year bond issuance in 2009. In fact, the unpaid principal amount of CLS-related losses was outstanding for considerably longer than three years, and Citibank reserves the right to recover interest at a higher rate. In addition, Citibank's February 1, 2013 demand of Barclays did not include as a component of Citibank's losses certain additional losses Citibank incurred as a result of its CLS exposure and Barclays' failure to timely fulfill its obligations pursuant to the Pledge Agreement and Supplement. Citibank reserves the right to recover these additional costs and all other costs in this action.

4122751.1

ZUCKERMAN SPAEDER LLP

By: _____
Andrew E. Tomback

Zuckerman Spaeder LLP
1185 Avenue of the Americas
New York, NY 10035-2603
(212) 704-9600
(212) 704-4256 fax
atomback@zuckerman.com

*Attorneys for Citibank, N.A.*

35

4122751.1