June 18, 2013

*VIA ELECTRONIC MAIL*

The Honorable Lorna G. Schofield
United States District Judge
UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK
500 Pearl Street
New York, New York 10007
Schofield_NYSDChambers@nysd.uscourts.gov

    Re: *Citibank, N.A.* v. *Barclays Bank, PLC*, Case 1:13–cv–3063–LGS

Dear Judge Schofield:

    In conformance with the Court's May 14, 2013 Order (Document 5), the parties submit this joint letter.

    **I.**    **Brief Statement of Case**

        A.  Plaintiff's Statement of the Case

    This case arises from substantial losses that Plaintiff Citibank incurred while providing foreign exchange ("FX") settlement services to Lehman Brothers Inc. ("LBI") during the height of the 2008 global financial crisis. Defendant Barclays indemnified Citibank for losses incurred in providing certain foreign exchange settlement services to LBI from September 17 to 19, 2008.

    Citibank served as LBI's designated settlement member in a foreign exchange settlement system called the Continuous Linked System ("CLS"). In settling trades for LBI through the CLS system, Citibank extended millions (and often billions) of dollars of credit to LBI, exposing Citibank to substantial risk of loss if LBI were to default. In the early morning hours of September 15, 2008, LBI's parent company, Lehman Brothers Holdings Inc., filed for bankruptcy protection in the Southern District of New York. Citibank agreed to continue clearing after LBI placed a $1 billion collateral deposit with Citibank that day. By September 17, 2008, LBI had nearly exhausted the $1 billion collateral deposit. As a result of LBI's precarious financial situation, and Citibank's desire to avoid uncollateralized losses on LBI's behalf, Citibank was unwilling to continue providing settlement services without first obtaining additional collateral. Because Barclays was in the process of purchasing LBI's U.S. broker–dealer business at this time, Barclays entered into a Pledge Agreement (the "Pledge Agreement") under which Barclays deposited with Citibank a $700 million cash pledge to induce Citibank to continue providing foreign exchange settlement services to LBI throughout this volatile period.

    When LBI failed to repay Citibank for the currencies that Citibank had purchased on LBI's behalf, Citibank exercised its contractual right to withhold from LBI currencies that Citibank had received from CLS for LBI's currency sales. By September 18, 2008, Citibank held

foreign currencies worth approximately USD 16 billion against USD 17 billion owed by LBI to Citibank for purchased currencies. The next day, the Securities Investor Protection Corporation placed LBI into liquidation, and Citibank began to unwind LBI's FX positions. At the conclusion of Citibank's efforts to unwind LBI's trades, Citibank was left with $1.260 billion in losses. Conversely, Barclays reported a day one profit of $4 billion as a result of its successful acquisition of LBI's U.S. brokerage business and related assets.

Several weeks later, Citibank and Barclays supplemented their Pledge Agreement (the "Supplement"). Pursuant to the Supplement, Citibank returned the $700 million deposited by Barclays and, in return, Barclays indemnified Citibank up to $700 million for the losses incurred as a result of providing CLS services to LBI between September 17 and 19, 2008. Citibank has calculated that its principal losses for the relevant time period exceed $580 million.

Although Citibank could have demanded immediate payment from Barclays to recover its $580 million in principal losses from September 17–19, Citibank first undertook to recover from LBI, the primary obligor, directly. Barclays benefited substantially from Citibank's strategy and efforts. Over the course of four and a half years, Citibank was able to reduce its CLS principal losses from $1.260 billion to just $91 million, exclusive of interest, costs, and fees. Citibank now seeks to recover from Barclays the remaining $91 million in principal losses, along with its interest, costs, and fees. Citibank first made a formal demand for payment from Barclays on February 1, 2013 (after determining the amount of recovery from LBI), but Citibank had regularly updated Barclays throughout the litigation and negotiations with LBI. Indeed, Citibank even invited Barclays, as indemnitor, to participate in the litigation, and Citibank repeatedly made clear that it would be looking to Barclays for any deficiency in its recovery from LBI.

While Barclays refuses to recognize its obligation to Citibank for amounts other than principal losses (and even there raises unreasonable objections), Barclays' position has no justification under the Pledge Agreement and Supplement. That is because Barclays expressly agreed to insure Citibank against "all obligations of . . . LBI now or hereafter existing under and in connection with the [CLS] Services, including, without limitation, whether for payment of any overdrafts, principal, interest, fees, expenses or otherwise[.]" (Pledge §2.)  In its proofs of claim against LBI, Citibank explicitly sought (but did not obtain) interest on the amounts owing. Barclays has had access to these proofs of claims for years.

Nor does the fact that LBI happened to have miscellaneous deposits, which were putatively offsetting, at accounts overseas with affiliates (such as Citibank Japan Ltd, Citibank Maghreb, and Citibank del Peru SA) or other branches of Citibank (such as Citibank's Nairobi Branch) relieve Barclays of its obligations to Citibank for the claimed interest on the unpaid CLS amounts. Indeed, Barclays, a sophisticated financial institution, expressly agreed not to raise any such argument (to the extent such an argument even exists) in defense of its obligations. Specifically, Barclays agreed that its obligations under the Pledge Agreement and Supplement "shall not be released, discharged or otherwise affected or impaired by . . . the existence of any claim, set-off or other right which . . . LBI may have at any time against the Bank . . . whether in connection herewith or any unrelated transaction[.]" (Pledge, §18.) The miscellaneous LBI deposits are precisely such "claim, set-off or other right" unrelated to CLS that Barclays agreed would have no effect whatsoever on its obligations to indemnify Citibank for LBI's obligations

relating to CLS. Moreover, LBI sued Citibank to recover these miscellaneous deposits and Citibank ultimately was required to return all of these deposits to LBI (along with any interest accrued on such deposits) in connection with the settlement with LBI. Finally, even if Barclays is right in its position that Citibank was essentially a secured creditor by virtue of these miscellaneous deposits (notwithstanding prior bankruptcy court rulings indicating there was no mutuality for setoff purposes), secured creditors who are cash collateralized are entitled to interest on their claims both inside and outside of bankruptcy; a creditor's possession of the cash security in no way deprives the creditor of the right to interest.

B. <u>Defendant's Statement of the Case</u>

Barclays does not dispute that it is obligated to indemnify Citibank for any actual losses it has incurred as a result of performing CLS-related settlement services for LBI from September 17 to 19, 2008.  However, Citibank has artificially inflated the amounts it seeks to recover from Barclays under this indemnification.

The most significant way in which Citibank has artificially inflated the amounts it seeks to recover is by adding an interest charge for a period of time of more than four years during which it had not suffered any out-of-pocket loss.  Specifically, from September 19, 2008 to December 13, 2012, Citibank and its affiliates held LBI assets in an amount that *exceeded* the $1.26 billion in losses Citibank claims to have suffered as a result of its performance of CLS-related services for LBI and its wind down of LBI's FX positions.  During the period from September 19, 2008 to December 13, 2012, Citibank and its affiliates retained all of these LBI assets, and therefore Citibank suffered no out-of-pocket loss from the CLS-related services it performed for LBI.  In addition, Citibank took the position (including in filed court submissions in the LBI bankruptcy) that it was entitled to setoff the CLS-related losses against the LBI assets that Citibank and its affiliates held in their possession.  During this period of time in which Citibank and its affiliates held LBI assets in their possession that exceeded its alleged losses from providing CLS-related services for LBI, Citibank did not make any demand for an indemnification payment from Barclays.  Moreover, during this period of time (and throughout the period prior to February 1, 2013), Citibank never communicated to Barclays that Citibank believed Barclays was or even might be liable for interest or any other ongoing "funding losses" Citibank now claims to have suffered during this period, whether characterized as "interest" or "capital charges" as set forth in Plaintiffs' computation of damages below.  It is therefore improper for Citibank to be charging Barclays any interest or capital charges for the period of time prior to Citibank suffering any out-of-pocket loss, and prior to Citibank making any demand for Barclays to pay money under the indemnity set forth in the Supplement.  During this period, Citibank incurred no funding cost and no capital cost.  Moreover, the interest Citibank is claiming is calculated at an excessively high rate, and is improperly compounded on a daily basis; similarly, the calculations underlying Citibank's "capital charge" claim are also based on unjustifiable and inaccurate assumptions.

It was not until December 13, 2012 that Citibank agreed in a settlement with LBI to repay a portion of the LBI assets Citibank held and had previously asserted could be offset against the losses Citibank allegedly suffered as a result of providing CLS-related services for LBI.  Thus, December 13, 2012 is the earliest possible date on which Citibank could claim to have suffered a

3

loss from its performance of CLS-related services for LBI that was not offset by LBI assets Citibank and its affiliates held in their possession. The Citibank-LBI settlement confirmed that Citibank was entitled to setoff over $1 billion of LBI assets against the CLS-related losses. In addition, it required Citibank to pay back a portion of the remaining LBI assets it held, and allowed Citibank to pursue claims against LBI for the alleged CLS-related losses that exceeded the amount of the agreed setoff. Citibank promptly sold its claims against LBI for over $160 million. Citibank alleges that the net effect of the Citibank-LBI settlement and the sale of Citibank's claims against LBI was to leave Citibank with a "principal" loss of approximately $91 million attributable to the CLS-related services Citibank performed for LBI between September 17 and 19, 2008. Citibank did not make a demand to Barclays to indemnify Citibank for this amount until February 1, 2013. As a matter of law, in a case against an indemnitor or guarantor, prejudgment interest is typically charged only from the date the indemnified party makes an actual demand. Thus, Barclays should not be charged any interest prior to February 1, 2013, and should not be charged any "capital charge" for any period of time.[1]

In addition to the interest issue, Barclays also disputes that the $91 million referenced above has been appropriately calculated. First, Citibank inflated that number by including over $26 million in "commission spreads" allegedly attributable to the profits its traders would have made if they had been paid by an outside party to unwind the LBI FX positions. Second, Citibank failed to unwind the LBI FX positions in a reasonable and timely manner, and hence failed to mitigate its potential losses. Most importantly, Citibank failed to unwind some of the positions until the week of September 22, 2008, which increased its alleged losses by as much as $47 million.

## II. Subject Matter Jurisdiction and Venue

### A. Plaintiff's Statement

The Court has subject matter jurisdiction over this action because the parties are diverse. Section 1332(a)(2) of Title 28 provides that the district courts shall have original jurisdiction over civil actions involving $75,000 that are between a citizen of a State and the subject of a foreign state. Plaintiff Citibank is a national banking association whose designated main office is in South Dakota. Citibank is therefore a citizen of the State of South Dakota. *See* 28 U.S.C. § 1348 (national banking associations are citizens of places in which they are "respectively located"); *Wachovia Bank* v. *Schmidt*, 546 U.S. 303, 307 (2006) (interpreting the phrase "respectively located" and holding that "a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located"). Barclays Bank PLC is a British banking corporation headquartered in London, England, and is therefore the subject of a foreign state.

Venue is appropriate because the parties agreed that any dispute arising out of their Pledge Agreement would be heard in the State and federal courts of New York. In addition,

---

[1] As shown in its Answer (which is being filed the same this letter is being submitted), Barclays also asserts that any prejudgment interest Citibank may claim for the period after February 1, 2013 should be eliminated or reduced based upon the Barclays good faith response to the demand, and a number of other defenses.

Barclays maintains offices in New York, and so under 28 U.S.C. § 1391(c)(2), is deemed to be a resident of New York for venue purposes.

B.  Defendant's Statement

Barclays does not dispute that this Court has subject matter jurisdiction over this action and that venue is appropriate.

### III.  Motions

Apart from two motions for admission pro hac vice, there are no pending motions. Citibank has no plans to file any motions at this early stage.

Barclays anticipates filing an early motion for partial summary judgment on Citibank's demand for "funding losses" (interest and capital charges), which Barclays believes will substantially narrow the issues to be resolved in this action.  Citibank disagrees that Barclays' proposed motion for partial summary judgment will narrow the issues, and disagrees that Barclays can establish "good cause" under IRP III.C.5, for filing a motion for summary judgment in this non-jury matter. In fact, Barclays' anticipated motion threatens to distract the parties from conducting discovery efficiently.

### IV.  Discovery

No discovery has yet taken place. Because this litigation turns on the amount of Plaintiff's damages, Plaintiff aims to take reasonably limited discovery. But given Barclays' indication that it will challenge the amount of Citibank's principal losses, there is likely to be fact-intensive discovery and the need for expert testimony.  Barclays anticipates discovery regarding the factual basis for the amounts that Citibank seeks, Citibank's wind down of LBI's FX positions in September 2008, and potentially (though not necessarily) on the negotiation of the Pledge Agreement and Supplement, and potentially (though not necessarily) on Citibank's treatment of various LBI assets and deposits that Citibank held and against which it claimed the right to setoff the CLS-related losses at issue in this case.

The parties have agreed to allow five contention interrogatories at the beginning of discovery (subject to the limits of FRCP 26 and 33), and Plaintiff has agreed that it will not oppose a reasonable increase in the deposition limit if Defendant needs more than 10 depositions.

### V.  **Plaintiff's Computation of Damages**

The following computation of damages reflects Citibank's current, conservative analysis of the damages incurred as a consequence of Citibank's provision of CLS services to LBI between September 17 and 19, 2008 and Barclays' breach of its obligations under the Pledge Agreement and Supplement. This calculation does not yet incorporate analysis or input from an outside damages expert. Citibank's damages analysis is ongoing, and Citibank intends to provide support for its computation of damages in its initial disclosures and/or in the course of discovery.

5

A. <u>Principal losses</u> of approximately $91 million arising from Barclays' breach of its obligations under the Pledge Agreement and Supplement to indemnify Citibank for Losses (as defined in the Pledge Agreement) that Citibank suffered as a result of providing CLS settlement services to LBI from September 17 to 19, 2008. These principal losses are calculated as follows:
   1. Citibank incurred total principal losses of $1.260 billion as a result of providing CLS services to LBI from September 15 to 19, 2008—$580 million of which is attributable to the September 17–19, 2008 period covered by the Pledge Agreement and Supplement.
   2. On September 19, 2008, Citibank set off LBI's $1 Billion Deposit against this $1.260 billion, leaving a principal deficiency of $260 million.
   3. On January 7, 2013, pursuant to the terms of a settlement with LBI, Citibank was permitted to retain the $1 Billion Deposit that it had already set off and set off an additional $7.6 million against its CLS claim, reducing Citibank's principal deficiency to $252 million.
   4. Under the settlement with LBI, Citibank also received an allowed general unsecured claim against the LBI estate in the amount of $252 million (the "CLS Unsecured Claim"). On April 23, 2013, after the sale of the CLS Unsecured Claim in an auction in which Barclays participated but was not the highest bidder, Citibank reduced its principal deficiency claim to approximately $91 million. This amount falls within the $580 million for which Barclays is responsible under the Pledge Agreement and Supplement.

B. <u>Funding losses</u>, including interest and capital charges, of approximately $93.5 million as of June 18, 2013 (and continuing to accrue), as a result of Citibank carrying the CLS deficiency claim since 2008. The funding losses are calculated as follows:
   1. Following its setoff against the $1 Billion Deposit, Citibank had a principal CLS deficiency claim of $260 million. Citibank has determined its annual cost of funding this deficiency at 4.65%, a rate derived from Citigroup's average cost of issuing long-term debt due to the illiquid nature of the claim. Thus, Citibank accrued interest on the $260 million CLS deficiency claim at 4.65% per annum, with annual compounding, from September 19, 2008 until November 30, 2011.
   2. In 2011, LBI sued Citibank and challenged, among other things, Citibank's right to set off the $1 Billion Deposit against its CLS losses. As a consequence of that litigation, and consistent with regulatory capital requirements, Citibank reinstated the full $1.260 billion CLS receivable on its balance sheet. As a result of the $1.260 billion receivable, regulatory capital rules required Citi to hold approximately $130 million of additional tier one common equity starting in December 2011, which attracted capital charges based on a formula derived from Citigroup's cost of equity.
   3. Because the additional tier one common equity only funded approximately half of the $260 million deficiency, from December 2011, Citibank, in addition to bearing the cost of holding the tier one equity, accrued 4.65% annual interest, with annual compounding, on the portion of the $260 million principal deficiency amount for which capital was not held, and which was therefore funded by debt.
   4. As noted, following Citibank's settlement with LBI and the sale of CLS Unsecured Claim in 2013, Citibank's principal deficiency was reduced from $260 million to $91 million, resulting in lower ongoing funding costs.

5. Overall, the portion of the funding losses attributable to interest is $55 million as of June 18, 2013, and the portion attributable to capital charges is $38.5 million as of June 18, 2013.

C. <u>Legal and advisory fees</u>, totaling approximately $750,000 to $1.25 million as of June 12, 2013, and which continue to accrue, incurred in connection with Citibank's settlement with LBI and enforcement of Barclays' indemnification obligation under the Pledge Agreement; and

D. <u>Pre-judgment interest</u>, to be calculated at the rate set in New York State by N.Y. C.P.L.R. § 5004.

Citibank reserves the right to update its calculation of each category of damages.

## VI. Status of Settlement Discussions

The parties have engaged in settlement discussions since Citibank submitted its February 1, 2013 demand. The parties do not believe that a settlement conference would be useful at this point, but are open to considering such a conference at some stage, so long as such a conference would not delay the development of the case, including both discovery and resolution of any motions.

| */s/ Andrew E. Tomback* | */s/ Jonathan D. Schiller* |
|---|---|
| Andrew E. Tomback | Jonathan D. Schiller |
| ZUCKERMAN SPAEDER LLP | BOIES, SCHILLER & FLEXNER LLP |
| 1185 Avenue of the Americas | 575 Lexington Avenue |
| New York, New York 10035-2603 | New York, New York 10022 |
| *Counsel for Plaintiff Citibank, N.A.* | *Counsel for Defendant Barclays Bank, PLC* |