UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                     :

CITIBANK, N.A.,                        :

                    Plaintiff,  :

                             :        13 Civ. 03063 (LGS)

          -against-           :

                             :        <u>OPINION AND ORDER</u>

BARCLAYS BANK, PLC,         :

                    Defendant.:

                             :
---------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       This is an action for breach of contract by Plaintiff Citibank, N.A. ("Citibank")

against Defendant Barclays Bank, PLC ("Barclays").  The claim arises from a 2004

agreement between Citibank and Lehman Brothers, Inc. ("Lehman"), which provided that

Citibank would clear Lehman's foreign exchange ("FX") transactions through the

Continuous Linked Settlement system (*i.e.,* provide "CLS Services"), and two 2008

agreements between Citibank and Barclays, which provided that Barclays would

indemnify Citibank for any losses incurred in providing CLS Services to Lehman from

September 17 through September 19, 2008 ("CLS Losses"), the tumultuous three days

just after Lehman's parent company, Lehman Brothers Holdings, Inc. ("LBHI"), filed for

bankruptcy protection and when Lehman was defaulting on its obligations, and Barclays

was petitioning the Bankruptcy Court to approve its acquisition of Lehman's broker-

dealer and investment banking assets.

       Barclays moves for partial summary judgment seeking dismissal of Citibank's

claims for funding losses in the form of interest and capital charges ("Funding Losses").

For purposes of this discussion, Funding Losses are distinct from principal losses, which

are the direct losses Citibank incurred in performing CLS Services to Lehman from

September 17 through September 19, 2008 ("Principal Losses").  Citibank moves for

partial summary judgment seeking an order that (1) Citibank is entitled to recover its

Funding Losses in amounts to be proved and (2) Barclays is barred from contending that

Lehman deposits held at Citibank provide a defense to Citibank's claims in this action.

For the reasons discussed below, Barclays' motion is denied, and Citibank's motion is

granted in part and denied in part.

In addition, the parties' briefs in connection with their cross-motions for summary

judgment raise the issue of statutory prejudgment interest.  Citibank asserts that statutory

prejudgment interest should be recoverable from the date of its initial CLS Losses, while

Barclays asserts that statutory prejudgment interest should not be recoverable before the

date Citibank demanded payment from Barclays.  Barclays also argues that New York's

statute providing for 9% prejudgment interest is unconstitutional.  For the reasons

discussed below, the statute is constitutional, and Citibank may claim prejudgment

interest from February 1, 2013, the date of its indemnification demand on Barclays.

## I.     Facts

The facts are taken from the parties' summary judgment papers and the exhibits

attached thereto and are viewed in the light most favorable to the non-moving party.

### A.  The CLS Agreement

On October 28, 2004, Citibank and Lehman entered into an agreement that

provides the terms under which Citibank would provide CLS Services to Lehman (the

"CLS Agreement").  Under the CLS Agreement, Citibank agreed to settle FX

transactions as Lehman's agent, and Lehman agreed to be liable for the settlements as the

principal (*Id.* at §1).  The CLS Agreement acknowledges that by settling Lehman's FX transactions, Citibank assumed a credit exposure on Lehman's behalf.  However, there is no provision in the CLS Agreement providing that Lehman would pay interest to Citibank.

Under the CLS Agreement, Lehman was required, on a daily basis, to repay fully all short balances, which consisted of the net funds paid by Citibank to settle Lehman's FX transactions.  As well, Citibank had the right to withhold any positive long positions Lehman had in any currencies to the extent of any short balances owed.  The CLS Agreement provided Citibank the right to terminate the arrangement immediately and without notice if, among other things, (1) Lehman failed to repay a short balance on time, (2) Lehman, its parent company or material subsidiary entered bankruptcy proceedings or (3) Lehman became unable to pay its debts as they came due.

### B.  Lehman's Default and Barclays' Request

On September 15, 2008, LBHI filed for bankruptcy protection.  The same day, Citibank terminated the CLS Agreement.  However, later that day, Citibank agreed to provide CLS Services to Lehman on September 16, 2008, because Lehman provided a $1 billion cash deposit as security (the "$1 Billion Deposit") and gave Citibank the right to set off the $1 Billion Deposit against any of Lehman's obligations under the CLS Agreement.

On September 16, 2008, Citibank agreed to provide CLS Services to Lehman for one additional day, September 17, 2008.  Also on September 16, 2008, Barclays signed an agreement to purchase Lehman's United States broker-dealer and investment banking assets.

3

On September 17, 2008, LBHI moved the Bankruptcy Court to approve Barclays'

acquisition.  Also on September 17, 2008, Citibank again terminated the CLS Agreement.

However, on the same day, at Barclays' request, Citibank agreed to withdraw its

termination of the CLS Agreement and continue to provide CLS Services to Lehman

because Barclays agreed to provide Citibank with $700 million in cash collateral (the

"$700 Million Collateral") and enter into an indemnification agreement (the "Pledge

Agreement").

### C.  The Pledge Agreement

The Pledge Agreement of September 17, 2008, is governed by New York law and

documents Barclays' pledge of the $700 Million Collateral.  In section 2, the Pledge

Agreement "secures the payment of" Barclays' and Lehman's obligations to Citibank in

connection with Citibank's continuing to provide CLS Services on and after September

17, 2008:

> (i) all obligations of [Barclays] and [Lehman] now or hereafter existing
> under and in connection with the Services, including, without limitation,
> whether for payment of any overdrafts, principal, interest, fees, expenses
> or otherwise, (ii) all obligations of [Barclays] and [Lehman] now or
> hereafter existing under each agreement of [Barclays] with respect to the
> Services (each a "Service Agreement") and (iii) all obligations of
> [Barclays] and [Lehman] now or hereafter existing under this Agreement
> (all such obligations of [Barclays] being collectively the "Obligations")

The Preliminary Statement within the Pledge Agreement defines Services as

follows:

> [Citibank] may from time to time in its sole discretion make
> available to [Barclays] and to [Lehman] certain cash management services
> which require the extension of credit by [Citibank] including, but not
> limited to, one or more of the following services: CLS Services, and
> daylight overdraft lines and temporary overdraft lines in connection with
> the provision of CLS Services (collectively, the "Services").

Section 18 of the Pledge Agreement provides that "[a]ll rights of [Citibank], all security interests hereunder and all obligations of [Barclays] hereunder are unconditional and absolute and independent and separate from . . . any other security for or guaranty of the Obligations, whether executed by [Barclays] or any other person or entity."

Section 18 also states that "the obligations of [Barclays] hereunder shall not be released, discharged or otherwise affected or impaired by," among other things:

> (v) the existence of any claim, set-off or other right which [Barclays] or [Lehman] may have at any time against [Citibank], or any other person or entity, whether in connection herewith or any unrelated transaction . . .

> (vii) any failure by [Citibank] . . .  (B) to give notice of the existence, creation or incurrence by [Barclays] or [Lehman] of any new or additional indebtedness or obligation under or with respect to Obligations . . . or (E) to proceed with due diligence in the collection, protection or realization upon any collateral securing the Obligations . . .

> (xi) any other act or omission to act or delay of any kind by [Citibank] or any other person or entity or any other circumstances whatsoever which might, but for the provisions of this clause, constitute a legal or equitable discharge of [Barclays'] obligations hereunder

Additionally, the Pledge Agreement contains a "no waiver" clause on the part of Citibank, which states:

> No failure or delay on t he part of [Citibank] to exercise, no c ourse of dealing with respect to, and no de lay in exercising, any right, power or privilege under this Agreement or any Service Agreement or any other document or agreement contemplated hereby or thereby and no course of dealing between [Citibank] and [Barclays] or [Lehman] shall operate as a waiver thereof  . . . .

### D.  Citibank's Unwinding of Lehman's FX Positions

From September 17 through 19, 2008, Citibank continued to provide CLS Services to Lehman.  On September 19, 2008, Citibank again terminated the CLS

Agreement, set off the $1 Billion Deposit (the "$1 Billion Setoff") and began to unwind

Lehman's FX positions.  Also on September 19, 2008, the Securities Investor Protection

Corporation placed Lehman in liquidation.  On the same day, the Bankruptcy Court heard

LBHI's motion to approve Barclays' acquisition of Lehman's broker-dealer and

investment banking assets.

On September 20, 2008, the Bankruptcy Court approved Barclays' acquisition,

and on September 22, 2008, the transaction closed.  The acquisition resulted in £2,262

million (approximately $4 billion at September 2008 exchange rates) in gains to

Barclays.  On September 23, 2008, Citibank informed Barclays that Citibank had

"determined that it likely holds substantial 'Obligations,' as Section 2 of the [Pledge]

Agreement defines that term, secured by the [$700 Million] Collateral . . . ."

On September 29, 2008, Citibank completed its unwinding of Lehman's FX

positions.  At this time, Citibank determined it had incurred "total principal losses of

$1.26 billion over the five day period from September 15-19, 2008—$580 million of

which is attributable to the shorter three-day period of September 17-19, 2008 covered by

the Pledge Agreement."  Taking into consideration the $1 Billion Setoff, Citibank's

Principal Losses were $260 million.

### E.  The Supplement

On November 13, 2008, Citibank agreed, in response to a request from Barclays,

to return the $700 Million Collateral to Barclays.  Also on November 13, 2008, Citibank

and Barclays executed a supplement to the Pledge Agreement, which is governed by New

York law, reflects the return of the $700 Million Collateral and revises the

indemnification provision in the Pledge Agreement (the "Supplement").

The Supplement states that Barclays agrees to indemnify Citibank for:

> *any and al l liabilities, obligations, losses, damages, penalties, claims, demands, actions, suits, judgments, costs and expenses of any kind*, including, without limitation, the reasonable fees and disbursements of counsel . . . in each case whether now existing or hereafter arising (each a "Loss" and collectively, "Losses") incurred or suffered . . . *relating to or arising out of [the Pledge] Agreement, the Services provided from and including September 17 through September 19, 2008*, or the Service Agreements in respect of such Services or in any other way connected with the enforcement of any of the terms of, or the preservation of any rights hereunder, or in any way relating to or arising out of the ownership, purchasing, delivery, control, acceptance, financing, possession, sale, return or other disposition of the [$700 Million] Collateral . . . or any claims arising as a result of any avoidance or reversal of any setoff . . . or application of other collateral . . . w hich Losses would have constituted Obligations under the Pledge Agreement secured by the [$700 Million] Collateral . . . .

(emphasis added).

### F.   Citibank's Litigation against Lehman

On May 22, 2009, Citibank filed a Proof of Claim with the Bankruptcy Court against Lehman for approximately $260 million, taking into account the $1 Billion Setoff.  In its Proof of Claim, Citibank alleged that it was entitled to set off and net out its claim against Lehman by using Lehman assets held by Citibank and its affiliates (the "Lehman Deposits").  Citibank then attempted to settle with the trustee assigned in the Lehman bankruptcy case ("Trustee"), but was unsuccessful.

On March 18, 2011, the Trustee filed an adversary proceeding against Citibank seeking a reversal of the $1 Billion Setoff and recovery of the $1 Billion Deposit as well as $342 million from the Lehman Deposits.  During the time Citibank was pursuing recovery of its losses from Lehman, Citibank communicated with Barclays regarding the CLS Losses and Barclays' obligations under the Pledge Agreement and Supplement ("Obligations").  On March 30, 2011, Citibank informed Barclays of Citibank's litigation

against Lehman, specifically that it included matters relevant to Barclays' Obligations, and invited Barclays to participate, which Barclays declined to do.

On May 26, 2011, Citibank moved the Bankruptcy Court to dismiss the Trustee's claims to the extent they challenged the $1 Billion Setoff.  On the same day, Citibank also moved the Bankruptcy Court to lift the automatic stay and allow Citibank to set off enough of the Lehman Deposits to eliminate its claim.  Citibank argued that it was authorized to exercise these setoffs without judicial relief, but was seeking relief out of an abundance of caution.

Citibank did not receive the relief it requested from the Bankruptcy Court. Consequently, Citibank reversed the $1 Billion Setoff and reinstated the entire $1.26 billion claim as a receivable on its balance sheet ("CLS Receivable").  The reinstatement of the $1 billion on Citibank's balance sheet required Citibank to hold approximately $130 million of "additional tier one common equity" in order to comply with regulatory capital requirements, beginning in December 2011.  However, Citibank's SEC filings show that Citibank did not raise any additional equity financing from December 2011 to the present.

On November 16, 2012, Citibank entered into a settlement agreement with the Trustee ("Settlement Agreement").  The Settlement Agreement permitted Citibank to set off the $1 Billion Deposit as well as $7.6 million from the Lehman Deposits.  The Settlement Agreement also allowed for a general unsecured claim against Lehman's estate for the remainder of Citibank's claim.  Additionally, pursuant to the Settlement Agreement, Citibank agreed to return over $360 million from the Lehman Deposits and relinquish its claims to set off those funds.

On December 13, 2012, the Bankruptcy Court approved the Settlement Agreement.  Then, on January 16, 2013, Citibank sold its unsecured claim against the Lehman estate for approximately $161 million.

### G.  Citibank's Losses and its Demand of Barclays

The Settlement Agreement and subsequent sale of Citibank's unsecured claim reduced Citibank's Principal Losses from the approximately $260 million discussed above to approximately $91 million.  On February 1, 2013, Citibank sent a letter to Barclays asking for payment of $137,985,745.75 pursuant to the Pledge Agreement and Supplement.  This amount included $90,790,543.93 in Principal Losses, $47,035,182.33 in interest (calculated at 3.748%) and $160,019.49 in legal fees and expenses.  This letter constituted Citibank's first formal demand to Barclays for payment.

Citibank filed its Complaint in this action on May 6, 2013, alleging breach of contract against Barclays for its "refusal to honor its agreement to indemnify Citibank." The Complaint pled damages of "substantially more than $141 million."

On June 18, 2013, the parties submitted a joint letter to the Court in which Citibank repeated its claim for $90.7 million in Principal Losses and alleged approximately $93.5 million in Funding Losses—consisting of interest of $55 million (calculated at 4.65%) and capital charges of $38.5 million.  To date, Barclays has not paid Citibank any of the requested funds, although Barclays apparently does not dispute that it owes Citibank for its Principal Losses.

### II.    Standard of Review

Summary judgment is appropriate only where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008).  A motion for summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict in favor of the" nonmoving party. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178–79 (2d Cir. 2008).

Whether contract provisions are ambiguous is a question of law.  *Ali v. Federal Ins. Co.*, 719 F.3d 83, 89 n.9 (2d Cir. 2013).  "If the relevant provisions are unambiguous, courts interpret and apply those provisions as a matter of law."  *Id.*  Courts must interpret the contract to "effectuate its plain language." *Seabury Const. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 68 (2d Cir. 2002).  "[C]ourts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning."  *U.S. Trust Co. of New York v. Jenner*, 168 F.3d 630, 632 (2d Cir. 1999) (internal quotation marks omitted).

## III.    Discussion

### A.  Prejudgment Interest

There are two distinct types of possible economic recovery in this case that are both described in the parties' summary judgment briefing using the term "interest."  It is important to distinguish between the two and to analyze them separately.

First, to be discussed in this section, is prejudgment interest.  A New York statute provides for prejudgment interest in certain types of cases, including those for breach of contract.  *See* N.Y. C.P.L.R. § 5001.  Prejudgment interest is not part of Barclays'

Obligations to be calculated under the relevant contracts, but is interest Citibank would recover *on* Barclays' Obligations, as determined by the Court, in order to compensate Citibank for not having use of this money during the time between Barclays' breach of contract, if a breach is found, and the Court's order of judgment. *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1139 (2d. Cir. 1994).

Second, to be discussed later, is the interest component of Citibank's claimed Funding Losses ("Funding Loss Interest"). Unlike prejudgment interest, this is not interest *on* Barclays' indemnification Obligations, but *is itself* allegedly part of those Obligations, *i.e.*, part of the indemnifiable CLS Losses. There is no concern that the two types of interest will create double recovery for the same loss, as Citibank has stated it will not pursue Funding Loss Interest for any period of time for which it is awarded prejudgment interest.

### 1. Constitutionality

Barclays asserts that New York's statute providing for 9% prejudgment interest is unconstitutional on its face as a violation of due process and as an unconstitutional taking and that the statute is unconstitutional as applied to the facts of this case. *See* N.Y. C.P.L.R. §§ 5001, 5004. Both arguments are without merit.

"It is well settled that facial constitutional challenges are disfavored." *Overstock.com, Inc. v. New York State Dept. of Taxation and Fin.*, 987 N.E.2d 621, 624 (N.Y. 2013). "There is a strong presumption that a statute duly enacted by the Legislature is constitutional." *People v. Pagnotta*, 253 N.E.2d 202, 205 (N.Y. 1969); *accord Overstock.com*, 987 N.E.2d at 624. Therefore, the party challenging the law must demonstrate its unconstitutionality "beyond a reasonable doubt." *Pagnotta*, 253 N.E.2d

at 205; *Overstock.com*, 987 N.E.2d at 624.  Barclays has failed to sustain this heavy burden.

The New York statute providing for 9% prejudgment interest is not a violation of due process.  The test for whether legislation that does not impact a fundamental right satisfies due process is whether it is "rationally related to legitimate government interests."  *People v. Knox*, 903 N.E.2d 1149, 1152 (N.Y. 2009); *accord Zalewska v. Cnty of Sullivan, New York*, 316 F.3d 314, 322 (2d Cir. 2003).

This "rational basis test" is "not a demanding one" and is instead "'a paradigm of judicial restraint.'"  *Knox*, 903 N.E.2d at 1154 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993)).  There is a "strong presumption" that statutes comply with due process, and "a party contending otherwise bears the heavy burden of showing that a statute is so unrelated to the achievement of any combination of legitimate purposes as to be irrational."  *Id.* (internal quotation marks omitted).  For a court to "'inquire into the de[g]ree of [the statute's] necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground.'"  *Zalewska*, 316 F.3d at 322 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 421–23 (1819)).

Here, New York's statute providing for 9% prejudgment interest rationally serves a legitimate government interest.  "[T]he function of prejudgment interest is to compensate . . . for the loss of use of money [a party] was owed during a particular period of time."  *Capital v. Republic of Argentina*, 952 N.E.2d 482, 494 (N.Y. 2011); *accord Toledo v Iglesia Ni Christo*, 962 N.E.2d 773, 777 (N.Y. 2012).  Prejudgment interest is "not a penalty against defendant."  *Toledo*, 962 N.E.2d 773 at 777.

Compensating injured parties for their losses is a legitimate state interest, and an interest rate of 9% is rationally related to this goal.  Even though 9% is higher than market rates in the current economy, there is no constitutional mandate that the statutory interest rate follow market rates point for point.  "The appropriate interest rate is not measured by particular fluctuations in categories of interest rates for public or private securities or lending."  *In re City of New York*, 887 N.Y.S.2d 776, 780 (N.Y. Sup. Ct. 2009) (quoting *In re County of Nassau*, 366 N.E.2d 287, 288 (N.Y. 1977)).  Many states have prejudgment interest rates of 9% or greater, and the Rhode Island Supreme Court held this year that a prejudgment interest rate of 12% is "even in today's economy . . . a reasonable measure of the loss sustained through delay in payment."  *Oden v. Schwartz*, 71 A.3d 438, 457 (R.I. 2013) (internal quotation marks omitted).

New York's statute providing for 9% prejudgment interest is not an unconstitutional taking.  Barclays is correct that the state may not take the property of a private party to give it to another private party without a public purpose.  *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005).  Here, however, as discussed above, there is a legitimate public purpose attached to New York's prejudgment interest statute.  "Where legislation adjusting the benefits and burdens of economic life withstands due process review, 'it would be surprising indeed to discover' that [the Legislature] had thereby committed an unconstitutional taking."  *In re Chateaugay Corp.*, 53 F.3d 478, 494 (2d Cir. 1995) (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 223 (1986)).  Therefore, Barclays has not shown that New York's statute providing for 9% prejudgment interest is unconstitutional on its face.

As for the claim that the statute is unconstitutional as applied to the facts in this case, such a determination would be premature at this stage of litigation.  Because the Court has not yet determined Barclays' liability or assessed any damages, concerns that the amount of prejudgment interest would be so disproportionate to actual damages that it would violate due process "remain hypothetical."  *See Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003).

Moreover, Barclays' is incorrect that the statute is unconstitutional as applied to the facts here because, allegedly, 9% prejudgment interest awarded "for over four and a half years prior to [Citibank's] making any demand on Barclays" would "impose results that are irrational and unjust." These concerns are unfounded in light of the Court's determination below, that any prejudgment interest in this case is recoverable only for the period after Citibank's demand for indemnification on February 1, 2013.

### 2.  Commencement of Accrual of Prejudgment Interest

Citibank argues that it should be able to recover prejudgment interest from the date of its initial CLS Losses, while Barclays argues that Citibank should not be able to recover prejudgment interest before the date of Citibank's demand for indemnification.  Barclay's position is correct as a matter of law.

The statute states that prejudgment interest "shall be computed from the earliest ascertainable date the cause of action existed."  N.Y. C.P.L.R. §5001(b).  Citibank's claim against Barclays in this action is for breach of contract.  "In New York, a breach of contract cause of action accrues at the time of the breach."  *Ely-Cruikshank Co. v Bank of Montreal*, 615 N.E. 985, 986 (N.Y. 1993).  Therefore, in breach of contract actions, "the earliest ascertainable date" referenced in C.P.L.R. §5001(b) for the purposes of

computing prejudgment interest "arises when the alleged breach occurred." *McNally Wellman Co. v. New York*, 63 F.3d 1188, 1200 (2d. Cir. 1995); *accord Paddington*, 34 F.3d at 1139. Therefore, Citibank cannot claim prejudgment interest prior to a breach by Barclays.

Barclays could not have breached the Pledge Agreement and Supplement until Citibank made its indemnification demand because "[n]on-performance is not a breach unless performance is due." Restatement (Second) of Contracts § 235 cmt. b (1981); *accord New York State Elec. & Gas Corp. v. State*, 630 N.Y.S.2d 412, 414 (3d Dep't 1995). Neither the Pledge Agreement nor the Supplement contain a specified time that payment from Barclays is due. When there is "no precise date for payment specifically fixed in the parties' contracts," the cause of action "accrue[s] when payment is demanded." *Stanford Square, L.L.C. v. Nomura Asset Capital Corp.*, 232 F. Supp. 2d 289, 292 (S.D.N.Y. 2002); *see also* 72 N.Y. Jur. 2d Interest and Usury § 38 (2d ed. 2013) ("Money does not become due and payable, and is not considered in default and interest does not begin to run, until a demand for it has been made.").

Accordingly, in breach of contract cases where there is no contractual due date for the payment of money, New York courts award prejudgment interest as of the date the plaintiff demanded payment. *See, e.g., Anderson v. Vasquez*, 950 N.Y.S.2d 143, 144 (2d Dep't 2012); *Eisen v. Feder*, 850 N.Y.S.2d 412, 414 (1st Dep't 2008); *American Cas. Co. of Reading, Pennsylvania v. Morgan-White*, No. 02 Civ. 931, 2003 WL 23374768, *8 (S.D.N.Y. September 30, 2003). Here, Citibank may claim prejudgment interest from the date of its indemnification demand on Barclays, February 1, 2013.

## B. Funding Losses

The parties have submitted cross motions for summary judgment on the issue of Citibank's potential recovery of its alleged Funding Losses. Barclays' motion to dismiss Citibank's claims for Funding Losses is denied. Citibank's motion to permit it to recover Funding Losses in amounts to be proved is granted.

There seems to be no dispute that Barclays owes Citibank for its Principal Losses (although there may be a dispute over the amount). The Funding Losses, which are in dispute, are the costs or losses that Citibank incurred in connection with carrying for over five years the debt, or Principal Losses, owed by Barclays.

The plain language of the Pledge Agreement and Supplement allow for Citibank to recover Funding Losses, so long as those losses are a part of the CLS Losses, *i.e.*, incurred as a result of Citibank providing CLS Services to Lehman from September 17 through 19, 2008. The language of the Pledge Agreement and Supplement is extremely expansive and inclusive.

The Supplement states that Barclays "agrees to indemnify" Citibank for "*any and all* liabilities . . . losses, damages . . . costs and expenses *of any kind* . . . incurred or suffered . . . related to or arising out of . . . [CLS] Services provided [to Lehman] from and including September 17 through September 19, 2008 . . . which losses would have constituted Obligations under the Pledge Agreement . . ." (emphasis added). The Pledge Agreement "secures the payment of . . . *all* obligations of [Barclays] and [Lehman] now or hereafter existing under and in connection with the [CLS] Services [provided to Lehman from September 17 through 19, 2008], *including, without limitation*, whether for payment of any overdrafts, principal, interest, fees, expenses or otherwise . . . ( . . .

16

collectively the 'Obligations')" (emphasis added).  It is clear from the plain language of the Pledge Agreement and Supplement that Barclays agreed to indemnify Citibank *fully* for any and all CLS Losses.

The facts relevant to this issue are not in dispute.  When LBHI filed its bankruptcy petition and Lehman began defaulting on its obligations, Citibank intended to terminate—and in fact, did terminate—its agreement with Lehman to provide CLS Services, and Citibank agreed to continue providing CLS Services to Lehman only after Barclays provided ironclad assurance that it would be the party responsible for any resulting economic loss.  Specifically, Citibank's termination of the CLS Agreement on September 17, 2008, and its decision to withdraw that termination only after it entered into the Pledge Agreement show that Citibank would not have agreed to provide CLS Services to Lehman if doing so would have put Citibank in a position to incur any economic loss that was not secured or indemnified by Barclays.

Therefore, Citibank is entitled to recover its Funding Losses, to the extent that Citibank can prove these losses were incurred and were a result of providing CLS Services to Lehman from September 17 through 19, 2008.

### 1.  Funding Loss Interest

The Funding Loss Interest claimed by Citibank consists of its alleged "cost of funding" the portion of its CLS Receivable that was not funded by equity at "a rate derived from Citigroup's average cost of issuing long-term debt due to the illiquid nature" of the CLS Receivable, which Citibank determined was 4.65%.

Barclays argues that Citibank should be precluded from recovering Funding Loss Interest because the relevant contracts do not "require Barclays to pay *interest on*" the

CLS Losses.  This argument fails.  As discussed in section III A above, Funding Loss

Interest is not interest *on* Citibank's indemnified CLS Losses, but is *itself* part of the

alleged indemnified CLS Losses.  Moreover, as discussed directly above, the broad,

expansive language of the Pledge Agreement and Supplement includes this type of loss.

Barclays also argues that reading the relevant agreements as allowing Citibank to

recover Funding Loss Interest would lead to "unreasonable" and "absurd" results, as

Citibank allegedly could have waited indefinitely, or at least until the statute of

limitations expired, to make an indemnification demand from Barclays, all the while

incurring Funding Loss Interest and increasing Barclays' Obligations.  This argument

also fails.

It is not unreasonable or absurd to read the Pledge Agreement and Supplement as

a promise that Barclays would make Citibank whole in exchange for, at Barclays'

request, taking on the risk of providing CLS Services to Lehman during its default.  A

sophisticated bank, like Barclays, is certainly aware that making a lending party whole

often includes the cost of carrying the debt.  It is more unreasonable to think that Citibank

would have agreed to carry a debt owed by Barclays of hundreds of millions of dollars

free of charge.  In any event, the parties' agreements are clear on their face that all of

Citibank's CLS Losses are recoverable.

The timing of Citibank's indemnification demand on Barclays was not

unreasonable, and allowing for recovery of Funding Loss Interest during this time would

not create an absurd result.  Citibank's delay in making its demand of Barclays did not

increase the amount of Barclays' Obligations; to the contrary, it greatly *decreased* the

amount of Barclays' Obligations.  Citibank waited to make a demand of Barclays because

Citibank was litigating against Lehman in the Bankruptcy Court in order to collect as much of its CLS Losses as possible from the primary obligor, Lehman.  During this time, Citibank made Barclays aware of the CLS Losses and even invited Barclays to join the litigation against Lehman.  Moreover, the Pledge Agreement expressly provides that Barclays' Obligations "shall not be released, discharged, or otherwise affected or impaired by . . . delay of any kind" by Citibank.

Barclays also argues, in the alternative, that Citibank should not be able to recover Funding Loss Interest before the date of the Settlement Agreement, December 13, 2012. First, Barclays argues that Citibank's possession of the $700 Million Collateral from September 17, 2008 through November 13, 2008 would have prevented it from incurring any CLS Losses during this time.  However, it is undisputed that Citibank returned the $700 Million Collateral to Barclays *with interest*; therefore, Citibank could not have used it to offset any CLS Losses, and ultimately the $700 Million Collateral was of no financial benefit to Citibank.

Second, Barclays argues that Citibank could not have suffered any CLS Losses at any time before December 13, 2012, due to the Lehman Deposits.  Barclays asserts that Citibank "held more [Lehman] funds than it claims it was owed" and that Citibank had "possession and full use" of these funds; therefore, Citibank was "in no different position than if it had been paid in full" by Lehman for its CLS Losses.  Barclays also asserts that since Citibank, in its litigation against Lehman in the Bankruptcy Court, asserted the right to use the Lehman Deposits to reduce its CLS Losses to zero, that Citibank's CLS Losses before the Settlement Agreement were in fact zero.

19

Barclays, however, has not produced sufficient evidence to prevail on summary judgment that Citibank in fact had "full use" of the Lehman Deposits, and Citibank contests this assertion.  While it is undisputed that Citibank argued in its litigation against Lehman that it should be entitled to use the Lehman Deposits for a setoff, it is also undisputed that these funds were subject to a bankruptcy stay and that the Bankruptcy Court ultimately rejected Citibank's argument and required Citibank to return the bulk of these funds to Lehman.

Citibank's degree of access to and ability to use the Lehman Deposits during the period between September 17, 2008 and December 13, 2012, involve questions of material fact, including, among others, what specific restrictions were placed on Citibank by the Bankruptcy Court regarding the funds; what Citibank actually did with the funds; whether Citibank gained any financial benefit from holding the funds; and whether Citibank returned the funds to Lehman with or without interest.  The dollar amount of the Lehman Deposits over the four-year period is also a genuine question of material fact.

Barclays' argument that there could not have been any CLS Losses between September 17, 2008, and December 13, 2012, must be evaluated on a full factual record. Nevertheless, resolution of this issue will not change the Court's general holding that, according to the plain language of the Pledge Agreement and Supplement, Citibank may recover all Funding Losses that it can prove occurred and resulted from its providing CLS Services to Lehman from September 17 through 19, 2008.

## 2.  Capital Charges

Citibank alleges that, starting in December 2011 when the amount of the CLS Receivable reached $1.26 billion, regulatory capital rules required it to hold

approximately $130 million of "additional tier one common equity . . . which attracted capital charges based on a formula derived from Citigroup's cost of equity" ("Capital Charges").

Barclays argues that Citibank should not be able to recover Capital Charges because there is no provision for Capital Charges in any of the relevant contracts. This argument fails because, as discussed above, the broad, expansive language of the Pledge Agreement and Supplement includes the cost of capital without its express mention. Barclays, a sophisticated financial institution, could have anticipated this loss when entering into the Pledge Agreement and Supplement, yet did not include language excluding losses of any kind, except those resulting from Citibank's "gross negligence or willful misconduct."

Barclays also argues that there could not have been any CLS Losses in the form of Capital Charges because Citibank did not raise any equity as a result of its CLS Receivable. Citibank argues that the fact that it did not raise equity is irrelevant because it was nevertheless required to hold equity specifically for the CLS Receivable, and absent the CLS Receivable, this equity would have been available for other uses. Barclays also argues that any losses due to Capital Charges are too speculative.

Whether Citibank actually incurred any CLS Losses in the form of Capital Charges, and their amount raise questions of material fact, which will need to be determined on a full record. Nevertheless, resolution of these issues will not change the general determination that, according to the plain language of the Pledge Agreement and Supplement, Citibank may recover all Funding Losses that it can prove occurred and

resulted from its providing CLS Services to Lehman from September 17 through 19, 2008.

### C.  Lehman Deposits

Citibank seeks a ruling that section 18 of the Pledge Agreement bars Barclays from contending that the Lehman Deposits provide a defense to Citibank's claims in this action.  Barclays argues that, because Citibank held the Lehman Deposits, it did not incur certain CLS Losses at certain times.  Citibank's motion is denied based on the plain language of section 18 of the Pledge Agreement.

Section 18 of the Pledge Agreement states that "all Obligations of [Barclays] hereunder are unconditional and absolute and independent and separate from any other . . . security for or guaranty of the Obligations".  Section 18 also states that "the Obligations of [Barclays] hereunder shall not be released, discharged or otherwise affected or impaired by . . . the existence of any claim, set-off or other right which [Barclays] or [Lehman] may have at any time against [Citibank] . . . whether in connection herewith or any unrelated transaction[.]"

Section 18 of the Pledge Agreement requires Barclays to indemnify Citibank for its CLS Losses, but it does not determine whether, as an initial matter, Citibank has incurred such losses for which indemnification is required.  Section 18 *does* bar Barclays from arguing that the Lehman Deposits caused Barclays' Obligations under the Pledge Agreement to be "released," "discharged," "affected" or "impaired;" in other words, it precludes Barclays from arguing that it can *avoid* its indemnification Obligations due to the Lehman Deposits.  However, section 18 does not bar Barclays from arguing that the Lehman Deposits prevented Barclays' indemnification Obligations from *arising in the*

22

*first place* or, what is essentially the same argument, that the Lehman Deposits prevented Citibank from incurring certain of its claimed CLS Losses.

Citibank argues that the language of Section 18 "functions to isolate Citibank's CLS-related losses by rendering them unaffected or altered in any way by Citibank and its affiliates' complex relationships with [Lehman.]"  However, there is not any language in section 18 that limits the arguments or defenses Barclays may make regarding Citibank's *losses* (or lack thereof); instead, the language limits Barclays' defenses regarding the discharge or release of its *Obligations*, which presupposes that the Obligations, and therefore the CLS Losses, existed to begin with.

Citibank also argues that the Lehman Deposits could not possibly have prevented Citibank from incurring CLS Losses because, as discussed above, Citibank was not permitted to use these funds; therefore, they could provide no financial benefit.  It is unnecessary to reach the merits of this argument because it rests on disputed issues of material fact, including, among others, the amounts of the Lehman Deposits over a four-year period; Citibank's degree of access to these funds; and Citibank's actual treatment of these funds.  Whether the Lehman Deposits kept Citibank from suffering certain of its claimed CLS Losses, or from suffering CLS Losses during a certain period of time, will be determined on a full factual record.

### IV.    Conclusion

For the reasons discussed above, this Court holds that: (1) Barclays' motion for summary judgment seeking dismissal of Citibank's claims for Funding Losses is DENIED; (2) Citibank's motion for summary judgment that Citibank is entitled to recover its Funding Losses in amounts to be proved is GRANTED; (3) Citibank's motion

for summary judgment that Barclays is barred from contending that the Lehman Deposits

provide a defense to Citibank's claims in this action is DENIED; (4) prejudgment interest

will not be recoverable before the date Citibank demanded payment from Barclays; and

(5) New York's statute providing for 9% prejudgment interest is constitutional.

      SO ORDERED.

November 22, 2013
New York, NY

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE